



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN THE MATTER OF THE SEARCH OF:

A RESIDENCE LOCATED AT 1817 10th FAIRWAY DRIVE, BELLEVILLE, ST. CLAIR COUNTY, ILLINOIS, DESCRIBED AS A SINGLE FAMILY, TWO STORY HOUSE WITH ATTACHED FOUR CAR GARAGE, WITH AN OFF WHITE SMOOTH FINISH, WHITE TRIM, AND A GRAY SHINGLE ROOF, WITH A CIRCLE DRIVE LOCATED IN FRONT OF THE RESIDENCE AND THE NUMBER 1817 ON THE FRONT OF THE MAIL BOX

Case No. 13-M-6019-CJP

**Filed Under Seal**

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

I, Julie E. Neiger, being first duly sworn, hereby depose and state as follows:

I am a Special Agent with the Federal Bureau of Investigation, and have reason to believe that on the person or on the premises known as:

A RESIDENCE LOCATED AT 1817 10th FAIRWAY DRIVE, BELLEVILLE, ST. CLAIR COUNTY, ILLINOIS, DESCRIBED AS A SINGLE FAMILY, TWO STORY HOUSE WITH ATTACHED FOUR CAR GARAGE, WITH AN OFF WHITE SMOOTH FINISH, WHITE TRIM, AND A GRAY SHINGLE ROOF, WITH A CIRCLE DRIVE LOCATED IN FRONT OF THE RESIDENCE AND THE NUMBER 1817 ON THE FRONT OF THE MAIL BOX

in the Southern District of Illinois, there is now concealed certain property, namely:

**SEE ATTACHED LIST, "ATTACHMENT A"**

which constitutes evidence of the commission of a criminal offense, or which is contraband, the fruits of crime, or things otherwise criminally possessed, or which is designed or intended for use, or which is or has been used as the means of committing an offense in violation of Title 18, United States Code, Section 922(g)(3).

# AFFIDAVIT

The facts to support the issuance of a Search Warrant are as follows:

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed for the past 10 years. As such, I am vested with the authority to investigate violations of federal laws, including Titles 18 and 21 of the United States Code. I am currently assigned to the Springfield Division of the FBI, Fairview Heights, Illinois Resident Agency, and have primary investigative responsibilities for crimes occurring within the Southern District of Illinois.

2. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, Confidential Sources (referred to as CS's), and Sources of Information (referred to as SOI's). This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. This Affidavit is made in support of a warrant to search for and seize evidence of violation Title 18, United States Code, Section 922(g)(3) specifically those items set forth in Attachment A of this Affidavit, from the residence of Michael N. Cook, located 1817 10th Fairway Drive, Belleville, St. Clair County, Illinois, described as a single family, two story house with attached four car garage, with an off white smooth finish, white trim, and gray shingle roof, with a circle drive located in front of the residence and the number 1817 on the front of the mail box.

## INVESTIGATION OF DRUG USE/POSSESSION

4.      On July 29, 2011, Justin D. Cahill (a 36 year old white male) was interviewed pursuant to a proffer agreement in the presence of his attorney. Cahill pled guilty to a charge of Conspiracy to Distribute a Controlled Substance. Cahill told your Affiant that an individual, known to Cahill as Mike "Buck" Reamer, obtained OxyContin pills from Cahill and would then give the pills to Michael N. Cook, a St. Clair County Circuit Court Judge.

5.      Cahill went on to state he supplied cocaine and/or OxyContin pills to James K. Fogarty, a St. Clair County Probation Officer and an unlawful drug user. From May 2010 to October 2010, Cahill and Reamer went to Fogarty's house in Belleville, Illinois, on numerous occasions to deliver drugs. On several of these occasions, Cahill observed several white males at Fogarty's residence. Reamer referred to the white males as "officials." Cahill did not know the individuals, but Reamer identified one as Judge Cook and one as an individual known as "Christ."

6.      Your Affiant queried public records and confirmed that Michael N. Cook (a 43 year old white male) is a St. Clair County Circuit Court Judge and that James K. Fogarty (a 45 year old white male) is a St. Clair County Probation Officer.

7.      Beginning in June, 2012, and continuing thereafter, your Affiant interviewed Cooperating Individual #1 (hereinafter referred to as CI#1). CI#1, a self-admitted former drug user, originally came to law enforcement and provided the information as detailed herein. CI#1 has not been paid, has not been charged with a crime, and is not currently under investigation. CI#1 told your Affiant that CI#1 has seen Judge Cook use cocaine "hundreds of times." CI#1 has also known Judge Cook to smoke marijuana and abuse prescription pain medication such as Vicodin or Darvoset.   CI#1 has seen Judge Cook abuse prescription medications on

approximately 50 to 60 separate occasions. CI#1 also witnessed Judge Cook use crack cocaine and marijuana multiple times. CI#1 claimed Judge Cook has been using drugs for the past 10 years.

8.   CI#1 went on to state that Tom Lee, a self-employed plumber from Belleville, Illinois is friends with Judge Cook. Lee provided Judge Cook with heroin that Lee obtained from Sean D. McGilvery, a heroin and cocaine distributor who lived at 112 South 35th Street in Belleville, Illinois. CI#1 detailed the ways in which Lee acquired heroin from McGilvery. Lee told CI#1 that on one occasion Judge Cook went with Lee to get cocaine from McGilvery. Lee also stated that in the summer of 2012, one week before leaving for vacation in Hawaii, Judge Cook had 12 grams of heroin in his possession. Lee told CI#1 that while Judge Cook was in Hawaii, Judge Cook met a "dirty doctor" from California who prescribed Percocet to Judge Cook. Lee also provided additional details of Judge Cook's prescription drug abuse.

9.   CI#1 continued, saying CI#1 knew through conversations with Lee that Judge Cook eventually started obtaining heroin directly from McGilvery, as opposed to using Lee. Judge Cook received cocaine from McGilvery in early 2012. Judge Cook met with McGilvery or possibly another person three or four times a week to get drugs. Judge Cook would only acquire heroin from McGilvery. Judge Cook and McGilvery have had a "user's relationship" for the past eight years. CI#1 believes Judge Cook has been getting more than an "8 ball" (an eighth of an ounce) up to a fourth of an ounce of heroin from McGilvery each time. Judge Cook used heroin at Lee's home four times a week and had access to Lee's home with a key Lee provided Judge Cook.

10. In June, 2012, CI#1 witnessed Judge Cook ingest a line of heroin and a line of cocaine by snorting both substances. In July, 2012, CI#1 witnessed Judge Cook crushing up Xanax and mixing it with heroin and then ingesting the heroin mixture.

11. CI#1 provided Judge Cook's cellular telephone number as 618-954-1016.

12. CI#1 was aware Judge Cook was friends with Joe Christ, who CS#1 later learned was an Assistant State's Attorney in St. Clair County, Illinois. CI#1 told your Affiant that Christ was a cocaine user, ingesting the drug by snorting it.

13. Your Affiant queried an internet fee for service database which indicated cellular telephone number 618-954-1016 was subscribed to and/or used by Judge Cook. Your Affiant queried public records and confirmed that Joseph D. Christ (a 49 year old white male at the time of his death on March 10, 2013) was a St. Clair County Assistant State's Attorney prior to being sworn in as a St. Clair County Associate Circuit Judge. Your Affiant confirmed through public records that Thomas M. Lee Plumbing & Heating is located at 3124 West Main Street in Belleville, Illinois, which was consistent with information previously provided by CI#1.

14. On January 21, 2013, Agents of the Metropolitan Enforcement Group of Southwestern Illinois (MEGSI) and the Drug Enforcement Administration (DEA) executed a search warrant at the home of Deborah A. Perkins and Douglas W. Oliver located at 20 Kassing Drive, Fairview Heights, Illinois. The home at 20 Kassing Drive had been involved in numerous heroin related activities documented by the Fairview Heights Police Department dating back to 1999. In the spring and summer of 2012, two individuals died from suspected heroin overdoses at the residence.

15. During the execution of the search warrant, McGilvery arrived at 20 Kassing Drive. McGilvery was taken into custody and transported to the Fairview Heights Police

Department. When asked by your Affiant if McGilvery would provide a statement to law enforcement, McGilvery advised he wished to consult an attorney. McGilvery also advised he would contact your Affiant later that day or by the next day.

16. On February 8, 2013, Deborah A. Perkins (a 65 year old black female) was interviewed pursuant to a proffer agreement in the presence of her attorney. Perkins, a convicted felon, told your Affiant that she knew McGilvery had been using and selling heroin since 2005. In February, 2008, Perkins and McGilvery began going to Chicago once a week to purchase heroin. Perkins estimated she and McGilvery made in excess of twenty trips to Chicago to acquire heroin, obtaining up to twenty-five grams per trip. Perkins and McGilvery were supposed to be "business partners." When Perkins and McGilvery returned from Chicago, Perkins would always give McGilvery all of the heroin they acquired. Perkins and McGilvery "parted ways" between September 2008 and April 2009.

17. Perkins also stated that beginning in the summer of 2009 and continuing until the summer of 2010, she began to travel to Chicago on a weekly basis to acquire heroin. Perkins would generally travel to Chicago alone, but on two of those occasions McGilvery accompanied Perkins. Perkins and McGilvery would pool their money with which to purchase the heroin. During that year, McGilvery gave Perkins money to purchase anywhere from twenty-five grams to one hundred grams of heroin each time Perkins went to Chicago.

18. Perkins continued, telling your Affiant that between Thanksgiving of 2011 and January 21, 2013, McGilvery would give Perkins between $2,500.00 and $5,000.00 every two weeks for Perkins to take to Chicago to purchase heroin. Several times Perkins received $3,500.00 from McGilvery. Perkins would acquire the heroin in Chicago and transport it to Fairview Heights, where McGilvery picked it up from Perkins.

19.     Perkins further advised your Affiant she never knew McGilvery's customers, but knew McGilvery was selling heroin to a "professional person" who worked at the St. Clair County courthouse. Perkins did not know the name of the person from the courthouse to whom McGilvery was selling heroin, but believed the person was a white male and who was also an attorney. On one occasion, Perkins asked McGilvery to talk to "his boy" at the courthouse to see what was going on with Perkins' pending criminal charge for concealment of a death. Perkins was told by McGilvery that "his boy" informed him that St. Clair County had so many murders, approximately 69 to 80, that it did not have enough money to "try" them all and that Perkins did not have to worry.

20.     Perkins went on to say that possibly in the summer of 2011, she went with McGilvery while McGilvery "served" a white male in his forties with at least a gram of heroin. The house they went to was located in Belleville, Illinois and had a swimming pool in the backyard.

21.     Your Affiant is aware that Judge Cook lives at 1817 10th Fairway Drive in Belleville, Illinois. Judge Cook's residence also has a swimming pool in the backyard. Your Affiant also confirmed with MEGSI SA Aaron Nyman that a MEGSI investigation revealed Perkins was traveling to Chicago to acquire heroin.

22.     On February 14, 2013, Douglas W. Oliver (a 47 year old black male) was interviewed pursuant to a proffer agreement in the presence of his attorney. Oliver, a convicted felon, is the son of Perkins and knew McGilvery. Oliver also believed based on conversations with McGilvery that McGilvery knew someone in the State's Attorney's Office along with other officials who could provide McGilvery information on Oliver's pending criminal charge for

7

concealment of a death. McGilvery told Oliver not to worry about his case because it was only a "probationable" matter and that Oliver would not be looking at serving a lot of time.

23. On March 4, 2013, due to the fact that McGilvery and/or his attorney never contacted your Affiant, FBI SA Nicholas J. Manns and your Affiant made contact with McGilvery at his current residence (309 North 38th Street, Belleville, Illinois). During the contact, McGilvery stated he spoke with an attorney who advised him not to talk to the FBI. McGilvery never retained the attorney, but followed the attorney's advice and did not contact the FBI. During the contact, McGilvery provided his cellular telephone number as 618-806-0305, saying he has had the telephone number "for years." McGilvery indicated he wished to cooperate with the FBI and would contact an attorney by that Wednesday after which McGilvery or his attorney would likely be in contact with your Affiant.

24. On March 11, 2013, AT&T provided subscriber information and toll records for 618-806-0305 for the time period March 10, 2012 to March 10, 2013, pursuant to an authorized subpoena. AT&T advised that the subscriber information for 618-806-0305 is Linda Gibson of 112 South 35th Street, Belleville, Illinois with a home e-mail address of SEANDON007.SM14@GMAIL.COM. Your Affiant is aware that Gibson is McGilvery's mother. Your Affiant also knows Gibson utilizes a different cellular telephone number.

25. A review of the historic records showed more than 2,000 telephone calls and/or other electronic communications, to and from cellular telephone number 618-806-0305 (previously identified as the cellular telephone number for McGilvery) and to and from cellular telephone number 618-954-1016 (previously identified as the cellular telephone number for Judge Cook) from March 10, 2012 to March 9, 2013. Moreover, the records showed cellular telephone number 618-806-0305 (associated with McGilvery) contacting cellular telephone

number 618-954-1016 (associated with Judge Cook) within minutes of your Affiant and SA Manns leaving the contact with McGilvery on March 4, 2013.

26.     On Sunday, March 10, 2013, former Assistant State's Attorney and newly appointed St. Clair County Associate Circuit Judge Joseph D. Christ (previously mentioned) died during a hunting trip with Judge Cook at Judge Cook's hunting cabin located at 33515 157th Avenue, Pleasant Hill, Pike County, Illinois. Christ was 49 years old at the time of his death. Personnel from Pike County Emergency Medical Services (EMS) and the Pike County Sheriff's Department (PCSD) responded to Judge Cook's hunting cabin following a 911 call from Judge Cook. At the hunting cabin, Christ was found deceased in a bathroom. Judge Cook offered no explanation as to the cause of Christ's death. While there, PCSD Chief Deputy Steve Lehr spoke with Judge Cook who indicated he and Christ came to the hunting cabin about every other weekend to hunt or get away.

27.     Christ's death investigation was conducted by the PCSD. During the investigation, on March 15, 2013, Pike County Sheriff (and Coroner) Paul F. Petty met and spoke with Judge Cook at a restaurant in Belleville, Illinois. During the conversation, when asked about prior cocaine use, Judge Cook ultimately admitted using in the past, claiming he started his drug use after the death of a sibling. Judge Cook further admitted he used cocaine the day prior to Christ's death, after Christ brought it out as the two drove to their hunting trip in Pike County. An autopsy was performed on Christ to determine the cause of death. Your Affiant reviewed a Report of Postmortem Examination (case number N-13-153) prepared by the Pike County Coroner's Office which indicated the cause of death for Christ as being "cocaine intoxication."

28. In reviewing the aforementioned AT&T records, your Affiant determined that cellular telephone number 618-954-1016 (associated with Judge Cook) contacted cellular telephone number 618-806-0305 (associated with McGilvery) on March 8, 2013 at 10:33 a.m. and at 5:17 p.m. Furthermore, cellular telephone number 618-806-0305 (associated with McGilvery) contacted cellular telephone number 618-954-1016 (associated with Judge Cook) on March 9, 2013 at 8:49 a.m.

29. A review of AT&T records by your Affiant showed more than 130 telephone calls and/or electronic communications, to and from cellular telephone number 618-806-0305 (associated with McGilvery) and to and from cellular telephone number 618-954-1016 (associated with Judge Cook) from April 6, 2013 to May 6, 2013.

30. On March 27, 2013, your Affiant drove by Judge Cook's residence (1817 10th Fairway Drive, Belleville, Illinois – previously referenced). While driving by, your Affiant observed a Maroon Ford Explorer Sport Trac bearing Illinois license plate L532957. Your Affiant also observed a camouflage pattern luggage rack on the roof of the vehicle. Your Affiant later caused a computerized check of Illinois license plate L532957 and learned it was to be displayed on a 2007 Ford carryall registered to Mike and Kori Cook of 1817 10th Fairway Drive, Belleville, Illinois. The computerized check also revealed the vehicle identification number (VIN) as 1FMEU53K27UA56640.

31. On April 16, April 19, April 23, and April 25, 2013, at your Affiant's request, Illinois State Police (ISP) Master Sergeant (MSgt.) Joe Beliveau and other MEGSI Agents conducted physical surveillance of Judge Cook, McGilvery, and/or their aforementioned residences in Belleville. MSgt. Beliveau and the MEGSI Agents are familiar with Judge Cook. On each occasion, Judge Cook was observed in his vehicle, the aforementioned Maroon Ford

Explorer Sport Trac, arriving at McGilvery's residence, exiting his vehicle, and entering McGilvery's residence using a door located on the south side of the residence, as opposed to using the front door located on the east side of the residence. After a short period of time, ranging from approximately three to twenty-nine minutes, Judge Cook was observed exiting the south door of the residence, walking to his vehicle, entering it, and leaving. On one occasion, Judge Cook was followed to his place of employment, the St. Clair County Courthouse in Belleville.

32.  On April 25, 2013, United States Magistrate Judge Stephen Williams signed a warrant (case number 13-mj-7039) authorizing the activation and monitoring of a Global Positioning System (GPS) tracking device for the aforementioned Sport Trac. The activation of the GPS tracking device allowed your Affiant to monitor the movement and physical location of the GPS device. In reviewing the data captured by the GPS tracking device for April 26, 2013 to May 13, 2013, your Affiant determined the aforementioned Sport Trac was in the vicinity of McGilvery's residence on April 26, April 27, April 28, April 29, April 30, May 1, May 2, May 4, May 6, May 8, May 9 (on two separate occasions), May 10, May 12, and May 13, 2013.

33.  In addition to the surveillance conducted by MEGSI, between April 26, 2013 and May 13, 2013, through additional law enforcement surveillance on McGilvery's residence, your Affiant confirmed Judge Cook's physical presence at McGilvery's residence on April 26, April 27, April 28, April 29, May 1, May 6, May 8, May 10, May 12, and May 13, 2013. On each occasion, Judge Cook was observed arriving at McGilvery's residence, exiting his vehicle, and entering the south door of the residence. After a short period of time (rarely exceeding 10 minutes, but never exceeding 30 minutes) Judge Cook was observed exiting McGilvery's

11

residence and leaving. Judge Cook was always observed driving the aforementioned Sport Trac to and from McGilvery's residence.

### INVESTIGATION OF FIREARMS POSSESSION

34.     On March 10, 2013, as previous mentioned, PCSD personnel responded to Judge Cook's hunting cabin, located at 33515 157th Avenue, Pleasant Hill, Pike County, Illinois, wherein they found Christ deceased. While at the hunting cabin, PCSD Corporal Matt Frazier observed multiple spent firearms casings and shells, which he believed to be .223 and 12 gauge caliber, in the driveway near the porch of the cabin. Inside of the cabin, Corporal Frazier observed a .50 caliber bolt action rifle, assorted ammunition, at least one firearms magazine which he believed to be for an "AR-15 type" rifle, a gun safe, and numerous gun cases. Corporal Frazier spoke with Judge Cook briefly at the scene. Judge Cook advised he owned the .50 caliber rifle, having won it and some .50 caliber ammunition at a raffle. PCSD personnel took some photographs and videotaped the scene. One of the photographs taken was of the .50 caliber bolt action rifle.

35.     CI#1 told your Affiant Judge Cook "got into hunting" four to five years ago. Judge Cook hunted ducks and had a hunting cabin. Although CI#1 did not know the exact location of the cabin, CI#1 thought it was approximately two hours away. CI#1 believed the hunting cabin and property were in Judge Cook's father's name, but felt Judge Cook was the only one who used the cabin.

36.     CI#1 recalled an incident when Judge Cook e-mailed a photograph of a rifle to Tom Lee (previously mentioned). Judge Cook told Lee he won the rifle at a raffle, although Lee did not believe Judge Cook. Lee speculated Judge Cook purchased the rifle. CI#1 obtained a copy of the photograph Judge Cook e-mailed to Lee and provided it to your Affiant. Your

12

Affiant reviewed the photograph of the rifle. In the photograph, the rifle is on a table next to a box which appears to contain tickets. Near the rifle is what appears to be a paper flyer with a picture of a rifle and the word "Armalite."

37. Your Affiant provided FBI SA Manns with the photograph of the .50 caliber bolt action rifle taken by PCSD personnel at Judge Cook's hunting cabin and the photograph of the rifle with the Armalite flyer provided by CI#1. SA Manns and others, to include PCSD Chief Deputy Steve Lehr and PCSD Corporal Matt Frazier, reviewed the two photographs and found the firearms depicted in the photographs looked alike. SA Manns then conducted a computerized on-line query of the web-site Armalite.com and found that Armalite Incorporated (Inc.) is a firearms manufacturer located in Geneseo, Illinois. On the web-site, SA Manns located an Armalite model 50A1B .50 caliber bolt action rifle. SA Manns and others, to include PCSD Chief Deputy Steve Lehr and PCSD Corporal Matt Frazier, compared the photograph of the Armalite model 50A1B to the two photographs provided by your Affiant and found they looked alike. Based on his review of all of the photographs, SA Manns believed the rifle depicted in the photograph taken by PCSD personnel at Judge Cook's hunting cabin to be the same rifle as depicted in the photograph provide by CI#1, an Armalite .50 caliber bolt action rifle.

38. SA Manns then reviewed the definition of a firearm as contained in Title 18, United States Code, Section 921(a)(3) which states, "The term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

39.     On May 13, 2013, SA Manns spoke with the Inventory Manager at Armalite Inc. located in Geneseo, Illinois. The Inventory Manager advised that the receivers for all Armalite .50 caliber rifles are initially machined in Geneseo, Illinois. Thereafter, each receiver is sent to Michigan for heat treating, after which it is returned to Illinois. Each receiver then undergoes additional machining in Illinois, after which each receiver is sent to Iowa where a special coating is applied. Thereafter, each Armalite .50 caliber rifle receiver is returned to Illinois for final assembly. Based on the information provided by Armalite Inc., your Affiant is aware that Armalite .50 caliber rifles, based on the receivers, are shipped or transported in interstate commerce.

40.     In the State of Illinois, individuals who own, possess, purchase, or sell firearms and/or ammunition are required by Illinois law to have an Illinois Firearm Owner's Identification Card, commonly referred to as a FOID Card. The FOID system is administered by the ISP. In order to obtain a FOID Card, an individual must fill out an ISP Application for Firearm Owner's Identification Card. The FOID Card Application requires the applicant to provide identifying information and answer eleven questions. Question 4 on the FOID Card Application reads, "Are you addicted to narcotics?" The FOID Card applicant must then sign the form which signifies the accuracy of the information. The caveat printed next to the signature box on the FOID Card Application reads in part, "I hereby solemnly affirm that the information contained herein is true to the best of my knowledge."

41.     Your Affiant caused a query of FOID records and determined Judge Cook filled out a FOID Card application, listing his full name, date of birth, Social Security Number, and Illinois Driver's License number. Judge Cook provided his address as 1817 10th Fairway Drive, Belleville, Illinois 62220. As to Question 4 (previously detailed) on the FOID Card Application,

Judge Cook checked the "No" box, denying he was addicted to narcotics. Judge Cook then signed the form. On March 13, 2009, the ISP issued a FOID Card 94263157 to Judge Cook with an expiration date of January 1, 2019.

42. At your Affiant's request, the ISP conducted an additional search, called an FTIP, for Judge Cook's FOID Card 94263157. The FTIP revealed that firearms dealers with Federal Firearms Licenses (FFL) conducted sixteen queries of Judge Cook's FOID Card 94263157 from January 9, 2010 to March 25, 2013. Three of the queries occurred in March, 2013. Such queries are often conducted when an individual purchases a firearm in the State of Illinois.

## FIREARMS AND RELATED ITEMS AND RECORDS

43. As a result of your Affiant's training and experience, along with the training and experience of various other investigators assisting your Affiant in this investigation, your Affiant is familiar with firearms and the records related to the purchase, possession, transfer, and sales of firearms. In the same respect, your Affiant is familiar with investigations involving violation of the Gun Control Act of 1968 as amended and codified in Chapter 44 of Title 18, United States Code (Sections 921 et seq.) including the unlawful act of possession of firearms and/or ammunition by an unlawful user of controlled substances. In addition, your Affiant is also familiar with the numerous documents and records generated during the purchase, transfer, and/or sales of firearms, as well as the documents generally maintained while in possession of firearms. Your Affiant's awareness of these practices as set forth in this Affidavit, arise from your Affiant's training and involvement in prior firearms investigations, as well as information provided to your Affiant by other law enforcement officers when relating their own experience, the results of their numerous firearms investigations, and their experiences in executing search warrants for firearms violations.

Based on this training and experience, your Affiant knows that:

44. Possession of firearms is a long term activity occurring over months and years, with many firearms owners keeping firearms and other items related to their firearms throughout their lifetime. These firearms and related items are generally kept close at hand in a secure location, generally at the residence of the person in possession and/or ownership of the firearms, but occasionally at other locations where the person has a need for firearms.

45. Persons who possess firearms usually possess other items related to firearms, such as: ammunition, gun boxes and cases, ammunition magazines, gun safes/vaults/strong boxes, ammunition boxes, firearms/instruction manuals, gun cleaning kits, reloading equipment and supplies, gun accessories, photographs of their firearms, firearms permits, literature from gun manufactures/retailers/internet sites, and receipts for the purchase of firearms and items related to firearms.

46. As in this case, in the State of Illinois, persons who own or possess firearms or ammunition are required by Illinois law to possess a valid FOID Card. On the back of each FOID Card is the "Requirement for Transfer" and "Firearm Owner's Identification Card Act Illinois Compile Statutes Chapter 430, Act 65/3." The printed information under this heading reads, in part: "(b) Any person within this State who transfers or causes to be transferred any firearm shall keep a record of such transfer for a period of 10 years from the date of transfer." The instructions then provide the details required in such a record which is to be maintained by the person.

47. As in this case, in some instances, firearms owners are hunters and/or firearms enthusiasts. Hunters will often possess records, documentation, and literature, to include hunting licenses, wildlife/waterfowl stamps, and hunting permits/tags (e.g., deer tags) required by federal and state governments to hunt. Such records are often indicative of firearms possession. Firearms enthusiasts will also possess documentation and literature regarding firearms, to include firearms periodicals, literature from firearms manufacturers and internet sites, receipts and gun range and shooting club membership documents.

48. During the course of firearms related searches, your Affiant and other agents have found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, videotapes, personal telephone books, diaries, utility and telephone bills, statements, identification documents, financial documents, mortgage bills, ownership warranties, payment receipts, identification, checkbooks, notes, and keys.

49. In some instances, these firearms records, as well as documents associated with firearms possession and dominion and control of the firearms owner's premises are maintained electronically, for example, on cellular telephones, computers and computer storage devices such as disks or flash drives, electronic organizers/address books, and telephone answering/recording machines. It has been your Affiant's experience that many such records will be kept close at hand, often at the firearms owner's primary residence so that the records are readily accessible and protected from loss or damage.

50. Persons who own or possess firearms, persons who hunt with firearms, and/or firearms enthusiasts often take, or cause to be taken, photographs and/or videotapes of themselves, their associates, their hunting trophies, and firearms which are indicative of their firearms possession. Such items are kept under their control over long periods of time.

51. In a number of searches in prior investigations that your Affiant and/or her fellow investigators have been involved in, these enumerated types of evidence have typically been recovered from the main residence and in addition, from other structures and areas on the property being searched, for example, in detached garages, other storage lockers/areas, detached closets, safes/vaults/strong boxes, containers, automobiles, computers, electronic storage devices, and yard areas associated with the main residence and used in connection with or within the curtilage of said residence, as well as from the persons of occupants or individuals located within.

52. Because very few firearms are completely manufactured or produced in the State of Illinois, the majority of firearms present in the Illinois have affected interstate commerce to be physically present within the State.

53. In a substantial number of searches executed in connection with the firearms investigations in which your Affiant and/or her fellow investigators have been involved, or informed of, the items listed in Attachment A have been recovered.

54. It is further requested that the Court order that all papers in support of this application, including the Affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to

18

all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation.

FURTHER AFFIANT SAITH NAUGHT

_____
Julie E. Neiger
Special Agent
Federal Bureau of Investigation

STEPHEN R. WIGGINTON
United States Attorney

James L. Porter
First Assistant United States Attorney

State of Illinois    )
                     ) SS.
County of St. Clair  )

Sworn to before me, and subscribed in my presence on the 15TH day of May, 2013, at East St. Louis, Illinois.

_____
Clifford J. Proud
United States Magistrate Judge

# **ATTACHMENT A**

a) Firearms and/or ammunition, to include an Armalite .50 caliber bolt action rifle;

b) Items related to firearms, such as: gun boxes and cases, ammunition magazines, gun safes/vaults, ammunition boxes, firearms/instruction manuals, gun cleaning kits, reloading equipment and supplies, gun accessories, photographs of their firearms, firearms permits, Illinois FOID Card 94263157, receipts for the purchase of firearms and items related to firearms, and literature from gun manufactures/retailers/internet sites;

c) Hunting and/or firearms enthusiasts records, documentation, and literature indicative of firearms possession, such as: hunting licenses, wildlife/waterfowl stamps, and hunting permits/tags (e.g., deer tags) required by federal and state governments to hunt, firearms periodicals, literature from firearms manufacturers and internet sites, and gun range and shooting club membership documents;

d) Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises that is the subject of this warrant, including but not limited to canceled mail, deeds, leases, rental agreements, photographs, videotapes, personal telephone books, diaries, utility and telephone bills, statements, identification documents, financial documents, mortgage bills, ownership warranties, payment receipts, identification, checkbooks, notes, and keys;

e) Personal books, papers, or electronically stored data (to include data stored on cellular telephones, computers and storage devices such as disks or flash drives, electronic organizers/address books, and telephone answering/recording machines) reflecting names, addresses, telephone numbers, and other contact or identification data relating to the possession of firearms and/or ammunition;

f) Photographs and/or videotapes of the owner/possessor of firearms, their associates, their hunting trophies, and firearms which are indicative of their firearms possession; and

g) Safes, vaults, strong boxes, or any other such items that may contain any of the aforementioned items.